# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI

MICHAEL DUNHAM MURPHY  #36193 )
(Full Name)              (Register No.) )
_____ )
_____ )
                              )
          Plaintiff(s),        )
                              )
    v.          **00**-6134 No. **C V - SJ - 4 - P** )
                              )
MISSOURI DEPARTMENT OF CORRECTIONS, )
(Full Name)                        )
WINFREY DICKERSON, DORA SCHRIRO,   )
                                   )
ELIJAH NAGBE, STEVE LONG & MIKE KEMNA )
                                   )
          Defendant(s).            )

## COMPLAINT UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983, 1985 & 1986

I.      Place of present confinement of plaintiff(s): Crossroads Correctional
Center, 1115 E. Pence Rd., Cameron, Missouri 64429

II.     Parties to this civil action:

Please give your commitment name and any other name(s) you have used while
incarcerated.

A.  Plaintiff: Michael Dunham Murphy          Register No. 36193
    Address: CRCC, 1115 E. Pence Rd., Cameron, MO 64429
    _____

B.  Defendant Missouri Department of Corrections
    is employed as _____
    at P.O. Box 236, Jefferson City, MO 65102

For additional plaintiffs or defendants, provide above information in same format on a
separate page.
                    See Attached Page
              For Additional Defendants.

5/96

II. Parties to this civil action (Continued):

Defendant Winfrey Dickerson
is employed as Supervisor of Religious/Spiritual Programming
at Missouri Department of Corrections, 2729 Plaza Dr., P.O.
Box 236, Jefferson City, MO 65102-0236

Defendant Dora Schriro
is employed as Director of the Missouri Department of Corrections
at 2729 Plaza Dr., P.O. Box 236, Jefferson City, MO 65102-0236

Defendant Elijah Nagbe
is employed as Chaplin
at Crossroads Correctional Center, 1115 E. Pence Rd., Cameron,
MO 64429

Defendant Steve Long
is employed as Assistant Director of the Missouri Department
of Corrections
at 2729 Plaza Dr., P.O. Box 236, Jefferson City, MO 65102-0236

Defendant Mike Kemna
is employed as Superintendent
at Crossroads Correctional Center, 1115 E. Pence Rd., Cameron,
MO 64429

1-A

III. Do your claims involve medical treatment?  Yes ___  No X

IV. Do you request a jury trial?  Yes ___  No X

V. Do you request money damages?  Yes X  No ___

State the amount claimed.  $ 3,600 / 3,600 (actual/punitive) / year

VI. Are the wrongs alleged in your complaint continuing to occur?  Yes X  No ___

VII. Grievance procedures:

A. Does your institution have an administrative or grievance procedure?

Yes X  No ___

B. Have the claims in this case been presented through an administrative or grievance procedure within the institution?  Yes X  No ___

C. If a grievance was filed, state the date your claims were presented, how they were presented, and the result of that procedure. (Attach a copy of the final result.)

Grievance filed April 20, 2000. On August 30, 2000 Asst. Director Steve Long refused to grant relief however forwarded Murphy's request to Mr. Winfrey Dickerson (MDOC religious supervisor) who never responded. (Grievance attached as Exhibit 1)

D. If you have not filed a grievance, state the reasons.

_____

_____

_____

VIII. Previous civil actions:

A. Have you begun other cases in state or federal courts dealing with the same facts involved in this case?  Yes X  No X

B. Have you begun other cases in state or federal courts relating to the conditions of or your treatment while in confinement?  Yes X  No ___

C. If your answer is "yes," to either of the above questions, provide the following information for each case.

(1) Style: Michael Murphy v. U.S.A. & Lee Shackelford
    (Plaintiff)          (v.)          (Defendant)

(2) Date filed: May 7, 1999

(3) Court where filed: U.S.D.C. Southern Dist. of Illinois

(4) Case number and citation: 99-470-GPM

5/96

2

**VIII.** Previous civil actions (continued):

(1) Murphy v. Missouri Department of Corrections
(2) Filed: 1984
(3) U.S. District Court, Eastern District of Missouri
(4) 814 F.2d 1252 (CA8 1987)
(5) Claim: Denial of First Amendment rights
(6) Disposition: March 19, 1987
(7) Disposition: Resolved
(8) Resolved for Plaintiff


(1) Murphy v. Missouri Department of Corrections
(2) Filed: 1984
(3) U.S. District Court, Eastern District of Missouri
(4) 769 F.2d 502 (CA8 1985)
(5) Claim: Retaliatory transfer/denial of First Amendment rights
(6) Disposition: August 2, 1985
(7) Disposition: Resolved
(8) Resolved for Plaintiff


Murphy has filed other civil actions in the 1980's however has
no records to reflect the specifics.

Case 5:00-cv-06134-GAF   Document 1   Filed 11/15/00   Page 4 of 52

(5) Basic claim made: Denial of dental care

_____

(6) Date of disposition: Pending

(7) Disposition: ___Pending_____
        [(pending) (on appeal) (resolved)]

(8) If resolved, state whether for:

_____

[(plaintiff) or (defendant)]

For additional cases, provide the above information in the same format on a separate page.

IX.   Statement of claim:

A.   State here as briefly as possible the facts of your claim. Describe how each named defendant is involved. Include the names of other persons involved, dates and places. Describe specifically the injuries incurred. Do not give legal arguments or cite cases or statutes. You may do that in Item "B" below. If you allege related claims, number and set forth each claim in a separate paragraph. Use as much space as you need to state the facts. Attach extra sheets, if necessary. Unrelated separate claims should be raised in a separate civil action.

On April 20, 2000 Murphy filed a formal request for "Israel Identity/Christian Separatist" Church services in the Missouri Department of Corrections (MDOC). The grievance procedure concluded on August 30, 2000 with Assistant Director of the MDOC refusing to grant relief and forwarding Murphy's Church request to Mr. Winfrey Dickerson (MDOC Religious Supervisor) who refuses to respond. Murphy presently has no viable state remedy to rectify this denial of First Amendment rights. (See attached Memorandum of Law in Support).

B.   State briefly your legal theory or cite appropriate authority:

Defendant's have denied Murphy the right to practice his religion in violation of the First & Fourteenth Amendments to the United States Constitution. (See attached Memorandum of Law in Support).

**(Continued on attached page 3-A)**

5/96

IX. B. (Continued)

The MDOC is a necessary Defendant due to obfuscatory tactics of its employees. As reflected in the exhibits attached to Murphy's Memorandum Of Law In Support Of His Complaint, Murphy formally requested "accommodation" of his religious beliefs from each Defendant to no avail. Murphy submits that Defendants willfully and maliciously denied his First and Fourteenth Amendment rights in: 1) denying religious accommodation in violation of the First Amendment's Free Exercise Clause, 2) promoting other religious groups in violation of the First Amendment's Establishment Clause, 3) promoting other religious groups while simultaneously denying Murphy's requested accommodation in violation of the Fourteenth Amendment's Equal Protection Clause.

Defendants point to no reason for their denial however the long history of Murphy's Theopolitical litigation against the MDOC reflects a conspiratorial long-standing pattern or practice of systemic invidious discrimination against Christian Separatists. The facts of Murphy's case reflect circumstances supporting a meeting of the minds (conspiracy under 42 U.S.C. §1985) and/or failure to act to stop an ongoing conspiracy (§1986). Detailed background and analysis is presented in the attached Memorandum Of Law.

X. Relief: State briefly exactly what you want the court to do for you. Make no legal arguments.

Declare Christian Separatism a religion with First Amendment

protection. Grant Injunction ordering accommodation of Christian

Separatism on equal footing with other accommodated religious

XI. Counsel: (Continued on attached page

A. If someone other than a lawyer is assisting you in preparing this case, state the person's name.

_____

B. Have you made any effort to contact a private lawyer to determine if he or she would represent you in this civil action? Yes ___ No X

If so, state the name(s) and address(es) of each lawyer contacted.

_____

_____

If not, state your reasons.

While Murphy was represented by Mr. Eric Schmitz (of Armstrong,

Teasdale in St. Louis) in Murphy, 814 F.2d 1252 (CA8 1987) he
(Continued on attached page

C. Have you previously had a lawyer representing you in a civil action in this court? Yes ___ No X

If so, state the lawyer's name and address:

_____

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed (signed) this _8th_ day of _November_, 20__.

_[signature]_

_____

(Signature(s) of Plaintiff(s))

5/96

4

X. Relief (Continued)

in the Missouri Department of Corrections.  Actual damages of
$10 per day from Defendants and each of them.  Punitive damages
of $10 per day from Defendants and each of them.  Cost of this
suit.


XI. Counsel (Continued)

does not know any federal civil attorneys in this area. Further,
the religious doctrine, which is the focus of this action, is
common to very few lawyers and may indeed be in conflict with
the beliefs of many.

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

MICHAEL DUNHAM MURPHY #36193,           )
                    Plaintiff,          )
        -vs-                            )
                                        )
MISSOURI DEPARTMENT OF                  )
CORRECTIONS, WINFREY DICKERSON,         )   Case No. _____
DORA SCHRIRO, ELIJAH NAGBE,             )
STEVE LONG & MIKE KEMNA,                )
                    Defendants.         )

MEMORANDUM OF LAW IN SUPPORT OF
COMPLAINT UNDER CIVIL RIGHTS ACT,
42 U.S.C. §§ 1983, 1985 & 1986

Comes now Plaintiff Michael Dunham Murphy, pro se, in the above styled cause and states the following to the Court.

Almost twenty years ago Murphy first sought to establish a Christian Separatist church in the Missouri Department of Corrections (MDOC). (Both Christian Separatist and Identity churches have all Caucasian membership -- a basic statement of beliefs is attached to Exhibits 1 & 6 and reflected in n. 1/, infra.) The litigation spanned almost a decade and Murphy was released on parole thereby mooting his injunctive relief.

On August 13, 1999 Murphy was returned to the MDOC for a technical parole violation. On April 20, 2000 Murphy filed a "formal request for recognition of Israel Identity/Christian Separatist Church[1/] services in the MDOC" via "IRR" (Informal Resolution Request). The request went unanswered and Murphy redrafted his request for Christian Separatist accommodation to include a ten page supporting memorandum (see, Exhibit 1). Murphy subsequently utilized the remaining institutional grievance procedure which culminated on August 30, 2000 with MDOC Assis-

tant Director Steve Long forwarding Murphy's request to Defendant "Mr. Winfrey Dickerson, Supervisor of Religious/Spiritual Programming at [MDOC] Central Office for review" (see, Exhibit 1 p.8).

Defendant Dickerson did not respond and on September 8, 2000 Murphy wrote a letter to Mr. Dickerson requesting a response. There has been no response. (Notably this reflects a long-standing tactic by the MDOC in ignoring Murphy's requests).

It is worthy of note that Murphy sent copies of his formal request with supporting memorandum (Exhibit 1) to Defendant Dora Schriro and Crossroads Correctional Center (CRCC) institutional chaplin Defendant Elijah Nagbe (a Black Muslim?) via certified mail (see, Exhibit 4). This was in addition to exhausting the MDOC grievance procedure (see, Exhibit 1, p.8). The instant case followed.

Notably, throughout the course of Murphy's religious accommodation requests, MDOC staff have used evasive and intimidating tactics to discourage Murphy's request for religious accommodation. In fact, when Defendant Nagbe called Murphy to his office regarding Murphy's accommodation request -- the primary topic was "race" not "religion." The exchange was adversarial and communication problems compounded by Defendant Nagbe's limited ability to properly enunciate words in the english language. The CRCC staff has stolen mail and Theopolitical literature and initially denied Murphy receipt of a Christian Separatist Church Society "Anointed Standard Translation" of the Bible which Murphy later obtained by invoking the institutional grievance procedure.

Since the focus of the instant case is not only the First Amendment's Free Exercise and Establishment Clauses, but also a Fourteenth Amendment Equal Protection Clause argument, MDOC treatment of other religions is highly relevant. Exemplary of the disparative treatment of Christian Separatists in the MDOC is refusal to recognize the Christian Separatist church while simultaneously recognizing four different Black (Negroid) Islamic faiths: (1) Moorish Science Temple of America (MSTA) temple #1, (2) MSTA branch temple #43, (3) Muslim and, (4) Nation of Islam. These Black Islamic groups are financed with inmate canteen fund money (see, Exhibit 2).

These Black Islamic groups broadcast their viewpoint on the institutional television channels (also financed via canteen fund money). The irony of all this is that the Black Islamic groups' violence against prison staff was the reason for the present "lock-down status" of CRCC.

## FIRST STATEMENT OF CLAIM

Defendants' denial of accommodation of Christian Separatism denied Murphy's rights under the Free Exercise Clause of the First Amendment to the United States Constitution

### Introduction

At issue here is the age-old problem of government control of religion -- a problem theoretically rectified in America by the First Amendment. This Nations' "founding fathers" wrested this power to worship according to the dictates of one's conscience from the hands of despots and conveyed it to each citizen.

Beginning almost twenty years ago Murphy sought to practice

his faith in the MDOC. His prior litigation was instrumental in receipt of Separatist Bibles and study materials for prisoners although recent problems at CRCC reflect a recurrence of blanket censorship and harassment for Christian Separatist literature. Indeed the dearth of supporting literature and church group reference is a result of Defendants' denial of Murphy's First Amendment rights. Recently institutional grievances were necessary for even Bible receipt.

Murphy's recent formal request for religious accommodation proved to be a hollow exercise in etiquette, reflecting a long-standing pattern or practice by the MDOC of suppression of White Christian Separatist religious practices while simultaneously promoting Black Islamic groups.

Standard of Review for
What Is A Religion

While opinions regarding just what is a religion are multi-tudinous, the courts have left us with some basic guidelines for evaluation:

"Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special

---

1/ For purposes of reference throughout this pleading, Israel Identity, Christian Identity, British Israelism and Christian Separatist Church will be collectively referred to as Christian Separatist. The basic tenets of Christian Separatism are reflected in the Basic Beliefs Of Christian Separatists That Differ From Judeo-Christian Sects, attached to Murphy's MDOC Grievance Appeal (Exhibit 1). A nutshell synopsis of Christian Separatism is reflected in Murphy v. MDOC, 814 F.2d 1252, 1254 (CA8 1987) (Murphy II) where the United States Court of Appeals for the Eighth Circuit described Murphy's belief system as a "religious belief that the white race is the chosen people of God and that racial integration is wrong or sinful."

protection to the exercise of religion. [] The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task [], the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas v. Review Board of the Indiana Employ-ment Security, 450 U.S. 707, 713-14, 101 S.Ct. 1425, 1430 (1981).

> "In evaluating whether a belief is religious in nature, the courts 'must take care to avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded as mere secular beliefs'." Mitchell v. Angelone, 82 F.Supp.2d 485, 490 (E.D.Va. 1999). "We have also recognized that a belief with political or secular aspects may be religious in nature." Murphy II @ 1256. Cf., Love v. Reed, 216 F.3d 682, 689 (CA8 2000)("a belief can be both secular and religious. The categories are not mutually exclusive. The First Amendment presumably protects the area where the two overlap").

Indeed "the question whether [] beliefs are entitled to Free Exercise protection turns on whether they are sincerely held, not on the ecclesiastical question...." Love @ 688 n.9. "Courts are not arbiters of scriptural interpretation." Thomas @ U.S. 716. The Love Court pointed to "three useful indicia [for defining] a religion for the purposes of First Amendment jurisprudence:

> First, a religion addresses fundamental and ultimate quest-ions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs." Id. @ 687.

Murphy submits that according to the above noted standards of review that the belief system of Christian Separatism is a relig-ion, the free exercise of which is protected by the First Amend-ment. That Murphy's request for Christian Separatist accommodat-ion does not rely on one specific church or study material source is of little moment:

"[T]he First Amendment does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.' The fact that the organization ... tolerates dissent within its ranks, does not mean that its views receive no First Amendment protect—ion." <u>Boy Scouts of America v. Dale</u>, ___ U.S. ___, 2000 WL 826941 *8 (2000).

"To suggest that [Murphy's] belief system falls short of being a religion would be to call into question the religious standing of all those who infuse Judaism, Christianity, or other 'traditional' religions with personal interpretation and introspection." <u>Love</u> @ 668-69.

### Differences between Christian Separatism and Other Faiths

As reflected in Exhibit 2 (MDOC Inmate Canteen Fund Memorandum), the MDOC chapel at CRCC recognizes nine different religious groups. Of these nine groups, four are Black Islamic. These groups are sanctioned by the MDOC and receive money from the Inmate Canteen Fund. In fact, the MSTA and Nation of Islam both have air time on the institutional religious television channel (clearly, this goes beyond accommodation of religious practice and instead reflects State sanctioned proselytizing). These other sanctioned religions have trappings of their faiths (fez and kufi hats, banners, pipes, feathers, medicine pouches etc.) See Exhibit 5 (Institutional Supplement IS22-1.1, approved headgear).

As reflected in Exhibits 1 & 6, no other sanctioned faith group in the MDOC holds related beliefs (see Murphy's Third Statement Of Claim for an in depth comparative analysis). In fact, the other so-called Christian groups are "born-againer" groups whose beliefs are totally repugnant to Christian Separatists. (Murphy submits that "born-againerism" is a virus introduced into the Christian faith in order to destabilize the common

ground of western culture via mongrelization).

## Discussion

As reflected in Exhibit 1 (basic Christian Separatist beliefs), Christian Separatism is grounded in a super-literal translation of the Scriptures. The key to understanding the message of the Scriptures is the Identity of the House of Israel -- hence the terms Israel Identity, Christian Identity and British Israelism.

Exemplary of the focus of study for Christian Separatists is the Anointed Standard Translation which is an exactingly literal translation of the Greek New Testament and, the Greek Septuagint (which was the text utilized by Jesus and the apostles). Books and tapes explaining these texts are supplied by numerous Christian Separatist churches (see, Exhibit 7, abbreviated list of Christian Separatist churches).

While Murphy's belief system incorporates both the "old" and "new" testaments of the Bible with Apocrypha, such a combination is a religion with First Amendment protection. See generally, _Love_, _supra_. Further, Christian Separatism would serve the religious needs of Israel Identity, Christian Identity, British Israelism and Christian Separatists.

In sum, Murphy submits that by any logical standard that Christian Separatism is a religion protected by the First Amendment's Free Exercise Clause. Further, the position is so unique that it cannot be served by any other religion presently accommodated by the MDOC.

## SECOND STATEMENT OF CLAIM

Defendants' support, under color of State authority,
of four Black Islamic groups, Wicca (witchcraft) and
other religious groups violates the Establishment Clause of the
First Amendment to the United States Constitution

### Standard of Review

"The clearest command of the Establishment Clause
is that one religious denomination cannot be officially
preferred over another [] This constitutional prohibition
of denominational preferences is inextricably connected
with the continuing vitality of the Free Exercise Clause.
Madison once noted: 'Security for civil rights must be
the same as that for religious rights. It consists in the
one case in the multiplicity of interests and in the other
in the multiplicity of sects.' Madison's version -- freedom
for all religion being guaranteed by free competition betwe-
en religions -- naturally assumed that every denomination
would be equally at liberty to exercise and propogate its
beliefs. But such equity would be impossible in an atmos-
phere of official denominational preference. Free exercise
thus can be guaranteed only when [officials] are required
to accord to their own religions the very same treatment
given to small, new, or unpopular denominations. As Justice
Jackson noted in another context, There is no more effective
practical guarantee against arbitrary and unreasonable
government than to require that the principles of law which
officials would impose upon a minority [456 U.S. 246] must
be imposed generally.' [] The government must be neutral
when it comes to competition between sects. [] The First
Amendment mandates governmental neutrality between religion
and religion.... The State may not adopt programs or pract-
ices ... which aid or oppose any religion.... **This prohibit-
ion is absolute.** [] And Justice Goldberg cogently articulat-
ed the relationship between the Establishment Clause and
the Free Exercise Clause when he said that '[t]he fullest
realization of true religious liberty requires that govern-
ment ... effect no favoritism among sects ... and that
it work deterrence of no religious belief.' [] In short,
when we are presented with a state [practice] granting
a denominational preference, our precedents demand that
we treat the law as suspect and that we apply strict scrut-
iny in adjudging its constitutionality." Larson v. Valente,
456 U.S. 228, 245-46, 102 S.Ct. 1673, 1683-84 (1982)(empha-
sis added).

In considering Murphy's challenge to Defendants' refusal
to accommodate Christian Separatists while simultaneously promot-
ing Islam, Witchcraft and "born-againerism," the Court should:

8

"determine whether [Defendants' refusal] discriminates against religious sects. If so, we apply strict scrutiny review under <u>Larson</u> [] In <u>Larson</u>, the Supreme Court held that a law that on its face grants a denominational preference may be upheld only if it is supported by a compelling state interest. [] To facially discriminate among religions, a law need not expressly distinguish between religions by sect name. [] Such discrimination can be evidenced by objective factors such as the law's legislative history and its <u>practical effect</u> while in operation." <u>Children's Healthcare Is A Legal Duty</u>, Inc. v. Min De Parle, 212 F.3d 1084, 1090 (CA8 2000)(internal citations omitted)(emphasis added).

## Discussion

Defendants finance their MDOC approved religions via the Inmate Canteen Fund (see, Exhibit 2). Defendants' also have Black Islamic television programs on the CRCC institutional "religious television channel." Both the MSTA and Nation of Islam have air time on the "religious channel" and Arabic language instruction available as a religious course. Further the MDOC approved religions have trappings of their faiths (fez and kufi hats (see, Exhibit 5), banners, pipes, feathers, medicine pouches etc.) which are financed via Inmate Canteen Fund money. This programming and financing goes beyond accommodation and instead reflects state established religious practices.

It is axiomatic that "government regulation may not favor one speaker over another []. Discrimination against speech because of its message is presumed to be unconstitutional." <u>Rosenberger v. Rector & Visitors of University</u>, 515 U.S. 819, 829, 115 S.Ct. 2510, 2516 (1995). As Clarence Darrow argued in <u>Scopes v. State</u>, 154 Tenn. 105, 289 S.W. 363 (1927)(oral argument 7):

"The realm of religion is where knowledge leaves off, and where faith begins, it has never needed the arm of the State for support, and whenever it has received it, it has harmed both the public and the religion it would pretend to serve."

The Defendants' position appears to be that they can establish what is an acceptable religion and that anyone wishing to practice a religious faith must accept one of their factions. There are presently no alternatives for Christian Separatists. The First Amendment was meant to protect us from such state established religions. In a recent and well reasoned prison case, the United States Court of Appeals for the Seventh Circuit enjoined such forced acceptance of a prison's "established" religion. In Sasnett v. Litscher, 197 F.3d 290, 292-93 (CA7 1999), the prison allowed only wearing of a "Rosary," not a cross:

> "The prison authorities opined that Protestants would not be bothered by the presence of the rosary, that they could simply ignore it and concentrate on the cross, but this shows a complete ignorance of religious feeling. One might as well tell Anglicans to kiss the Pope's ring but pretend he's the Archbishop of Canterbury. The ... prison system, without the ghost of a reason, has decided to discriminate against Protestants, and in doing so it has violated the First Amendment and must be enjoined. [] Nothing ... allows the government to pick and choose between religions without any justification." (emphasis added).

As the Supreme Court held recently in Boy Scouts of America, supra, @ *11:

> "The First Amendment protects expression, be it of the popular variety or not [] And the fact that an idea ["born-againerism" & Islam] may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view."

In light of the above discussion, Murphy submits that Defendants' actions discriminate against Christian Separatists. Indeed Murphy's twenty year odyssey through the courts reflects that the Practical effect of the MDOC policy to deny Christian Separatist services has been to violate Murphy's First Amendment

rights and establish state sanctioned religions. Therefore Murphy submits that the Defendants have violated the Establishment Clause and must be enjoined.

## THIRD STATEMENT OF CLAIM

Defendants' denial of accommodation of Christian Separatists while simultaneously promoting other religious groups denied Murphy's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

### Standard of Review

Since the MDOC treatment of other religions is a critical factor in the proper evaluation of Murphy's claims, his case calls for careful examination illuminated by the Equal Protection Clause. In City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985) the Supreme Court held:

> "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."

In Reyler v. Purkett, 137 F.3d 1047, 1051 (CA8 1998) the United States Court of Appeals for the Eighth Circuit applied the Equal Protection Clause to inmates:

> "The heart of an equal protection claim is that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest."

"Nothing allows the government to pick and choose between religions without any justification." Sasnett, supra, @ 292. A "government regulation may not favor one speaker over another." Rosenberger, supra, @ U.S. 829, S.Ct. @ 2516.

11

## Comparative Analysis
## with Accommodated Religions

In the MDOC the two dominating religions are Black Islamic and "born-again" (Judeo) Christian. Other smaller groups are made up of Wicca (witchcraft) and Native American (Indian) (see, Exhibit 2). A statement of Christian Separatist beliefs is presented in Exhibits 1 & 6. A basic comparison of these is presented here.

## "Born-Again" Christians

Murphy submits that the "born-againer" groups are the ultimate corruption of the Christian faith. While they present various schisms the main thrust of these groups is a global-monoculturist/one-world order, social services group with many similarities to Marxism. Most rely on modern corrupt versions of the Bible and either: (1) deny the existence of the House of Israel as a race or (2) believe those who today call themselves "Jews" are Israelites (hence the term "Judeo Christian."

All "born-againer" services in the MDOC are racially integrated and present a charismatic foremat more like a circus than a church.

## Black Islamic Groups

The basic religious text of all Islamic groups is the "Koran" which exhorts Muslims to kill Jews, Christians, and other non-Muslims. In the "Book of Repentance" alone, there are sixteen such directives: 5, 9, 12, 14, 20, 24, 29, 36, 41, 44, 73, 81, 86, 88, 111, and 123.

"Black Muslims espouse racial separation or superiority. Lee v. Crouse, 284 F.Supp. 541 (D.Kan. 1967)(Black

Muslim sect which espoused separationism and belief in ultimate holy war with whites, is derived from Islamic teachings and should be considered a religion). In a recent speech at Kean College in New Jersey, Khalid Abdul Muhammed, the Nation of Islam's former spokesman, vilified Jews, Roman Catholics, homosexuals, whites in general, and some blacks. New Jersey Law Journal, Jan. 24, 1994, at 17. Specifically, Muhammed labeled Jews 'bloodsuckers of the black nation'." <u>Good News/Good Sports Club v. School District of Ladue</u>, 28 F.3d 1501 (CA8 1994). A more global perspective on Islam reflects "Muslims should kill Americans." <u>U.S. v. EL-Hage</u>, 213 F.3d 74 (CA2 2000).

In a prison setting the Black Islamic position is the antithesis of Western culture in general. Specifically worthy of note is that Black Islamic violence against correctional staff is the reason for the present lock-down status at CRCC. The MSTA, which has two different sanctioned groups in the MDOC, is "suspected of drug trafficking, murder, and other related crimes." <u>Washington v. DEA</u>, 183 F.3d 868, 870 (CA8 1999). They wear distinct headgear (kufi & fez (see Exhibit 5)) and use banners and pins to reflect their affiliations. All four Black Islamic groups receive money from the Inmate Canteen Fund (see, Exhibit 2). Further, the MSTA and Nation of Islam both have programs on the institutional television religious channel.

Caselaw on these prison Black Islamic groups reflects:

The Nation of Islam has militant and confrontational beliefs <u>Hobbs v. Pennell</u>, 754 F.Supp. 1040, 1047-50 (D.Del. 1991);

"Restrictions imposed on the Muslim inmates were a response to fights and the discovery of weapons in the chapel [Muslim chapel area at JCCC]." <u>Aziz v. Moore</u>, 8 F.3d 13, 14 (CA8 1993);

MSTA creates dangerous disturbance in chapel. <u>Pinkston -EL v. Washington</u>, 215 F.3d 1330 (CA7 2000);

Muslim inmate given disciplinary sanction for attempting to show other prisoners Nation of Islam video "Kill Them All." <u>Shields v. Campbell</u>, 208 F.3d 215 (CA6 2000);

Nation of Islam inmates sue because they were not allowed to post inmate "guards" on their services to warn if prison officials approached. Nation of Islam inmates also "marched in formation." <u>Mabon v. Campbell</u>, 205 F.3d 1340 (CA6 2000);

Defendant claimed "as an officer of the Moorish Science Temple he was not subject to the jurisdiction of a United States District Court." U.S. v. Frazier-EL, 204 F.3d 553, 559 (CA4 2000);

"'Jihad' ... a struggle against the enemies of Islam [] Jihad against Egypt and the United States is mandated by the Qur'an [Koran]" U.S. v. Rahman, 189 F.3d 88, 104 (CA2 1999);

Court "identified the Five Percenters [Nation of Islam] as a racist, violent group presenting an organized threat to prison security. [] Five Percenters remain free to pray, fast, and study religious materials." In re Long Term Administrative Segregation of Inmates Designated As Five Percenters, 174 F.3d 464, 470 (CA4 1999);

El contended that he was bound only by the laws of the Moorish Zodiac Constitution...." EL v. Riverside Maintenance Corp., 173 F.3d 844 (CA2 1999).

As a closing note, Portley-EL v. Zavaras, 188 F.3d 519 (CA10 1999) reflects that many Muslims consider the Nation of Islams' leader Louis Farrakhan a messenger of Allah and that Farrakhan's "Million Man March [of October 16, 1995] was a holy day." Indeed the Islamic Million Man March of 1995 is quite well remembered in the federal prison system where Black Islamic prison disturbances resulted in a multitude of prison staff injuries and millions of dollars in damage. "[A]t the Federal Correctional Institution in Greenville, Illinois, on October 20, 1995. The riot damaged the prison to the tune of $750,000 and ..., involved nonwhite prisoners." U.S. v. Ricketts, 146 F.3d 492, 493-94 (CA7 1998)(emphasis added). Indeed Murphy was present and observed the Greenville riot which started about twenty feet from his cell. Rioters could be heard to yell "Islam bro."

## Wicca Groups

Little is known about the Wicca groups witchcraft practices. They are neither Christian or Islamic.

## Native American Groups

The Native American (Indian) groups generally hold their services in a fenced and separated area of the prison compound. They use drums and smoke a pipe. They are basically a separatist faith founded on bloodline.

## Discussion

The facts of the instant case, evaluated in light of the Equal Protection Clause, reflect disparative treatment of Constitutional magnitude. The MDOC has set-up what are essentially State <u>sanctioned</u> and <u>financed</u> religions (i.e., "accommodated").

> "A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed.
> The lessons of the First Amendment are as urgent in the modern world as in the 18th Century when it was written. One timeless lesson is that if citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." <u>Lee v. Weisman</u>, 505 U.S. 577, 592, 112 S.Ct. 2649, 2658 (1992).
> "We have held time and time again that the government generally may not treat people differently based on the God or gods they worship." <u>Rosenberger</u>, <u>supra</u>, @ U.S. 846.

Throughout the course of Murphy's quest for the right to practice his religion in the MDOC, he has asked for nothing more than the same opportunities extended to the MDOC accommodated religions. Notably, many of these accommodated religions are separatist and hold militant and confrontational doctrines which have resulted in frequent institutional problems.

In sum, Murphy submits that the glaring disparity in treatment of Christian Separatists reflects a blatant violation of the Equal Protection Clause.

General Standard of Review
for Prison Regulations

The constitutionality of prison regulations is evaluated under the four-factor test of Turner v. Safley, 482 U.S. 78, 89-91, 107 S.Ct. 2254 (1987). Turner sets the standards for determining the reasonableness of prison regulations. This test reflects:

1) "[T]here must be a valid rational connection between the prison regulation and the legitimate governmental interest [which operates] in a neutral fashion, without regard to the content of the expression." Id. @ U.S. 89-90.

2) Are there "other avenues available for the exercise of the asserted right." Id. @ U.S. 90.

3) "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates...." Ibid.

4) "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. [] By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. [] But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. @ 90-91, S.Ct. @ 2262.

Discussion

The Turner test applied to the facts of Murphy's case reflects:

1) There is no valid rational connection, operating in a neutral fashion, in denying accommodation of Christian Separatists. The focus of Defendants' denial of accommodation is aimed at suppression of expression. There is no legitimate governmental interest in suppression of expression (see generally, Johnson v. Texas, 491 U.S. 397, 109 S.Ct. 2533 (1989). A cursory glance

at the accommodated religious groups in the MDOC (Exhibit 2) reflects refusal to accommodate Christian Separatists is not a neutral posture. The facts herein reflect long-standing systemic (rather than localized) violations of Murphy's First and Fourteenth Amendment rights.

2) There are no other avenues available for exercise of religious practices. Defendants have gone as far as to censor Christian Separatist study material -- including an Anointed Standard Translation of the Bible. There are no places for study groups to meet except the chapel (although Defendants could designate alternative areas such as the special area built for the Native American group). Defendants' refusal to allocate inmate canteen fund money for Christian Separatist studies operates as a fine or economic coercion on Christian Separatists who have the option of forfeiting their beliefs or forfeiting state benefits via MDOC religious funding. "Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed ... for ...worship." Thomas v. Review Board, supra, @ U.S. 717.

3) There would be no adverse impact on guards or other inmates. Inmates declare their religious preference upon entry to the MDOC and there is no cross-religious activity -- "only the members of a respective [religious] tradition should be in positions of leadership or speaking before the group, unless a special ecumenical or inter-faith format has been authorized." See, Exhibit 3, a Religious Organization Memorandum by Defendant Dickerson.

Since the violence against guards by Black Islamic groups was instrumental in the present lock-down status of CRCC, Defendants evidently do not see religious affiliations as a criteria for a security threat. There have been no limitations placed on the practice of Islam even though caselaw regarding the activities of Black Islamic groups (see pages 13 & 14 supra.) reflects that their disruption of prisons is common.

Assuming arguendo that "[s]ome inmates might take any opportunity to cause trouble [], if the rights of those who would cooperate could be sacrificed in the fear of those who would cause trouble under any regime, officials could ignore any individual right. Inmates do not abandon their rights to individualized judgments about their behavior." Salaam v. Lockhart, 905 F.2d 1168, 1175 (CA8 1990).

A cursory glance at the accommodated religions in the MDOC (Exhibit 2) reflects religions in total disagreement with one another. Evidently Defendants believe that this creates no adverse "impact ... on guards and other inmates." Turner @ U.S. 90.

4) There are obvious, easy alternatives to Defendants' denial of accommodation -- simply allow Christian Separatists the same status as the other nine accommodated religions. Murphy asks for no more than the presently practicing faiths.

Therefore, Murphy submits that his request for religious accommodation, vis-a-vis the Turner analysis, reflects that Defendants' denial of his request is not reasonable. Cf., Williams v. Brimeyer, 116 F.3d 351, 354 (CA8 1997)( an Aryan Nations materials case holding):

"The question generally stated is whether [denial of accommodation] is reasonably related to a legitimate penological objective []. In considering this question, we must decide, 'after an independent review of the evidence ,' whether the [denial of accommodation] 'is ... an exaggerated response to prison concerns.' [Christian Separatism] did not counsel violence, and there is no evidence that [it has] ever caused a disruption. <u>Certainly the views expressed ... are racist and separatist, but religious [practice] may not be banned on that ground alone.</u>" (emphasis added).

## DAMAGES

### Standard of Review

Title 42 U.S.C. §1997e still allows relief for deprivation of First Amendment rights aside from mental, physical or emotional injury. "A deprivation of First Amendment rights standing alone is a cognizable injury [even under 42 U.S.C. §1997e(e)]." <u>Rowe v. Shake</u>, 196 F.3d 778, 781 (CA7 1999)(plaintiff proved requisite irreparable harm required to secure preliminary injunction because loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury).

"Punitive damages are appropriate in a federal civil rights action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others'." <u>Badami v. Flood</u>, 214 F.3d 994, 997 (CA8 2000).

As to liability of each of the individual Defendants, Murphy submits that:

"(1) He has asserted a violation of Constitutional ... right[s]; (2) the right[s] w[ere] clearly established at the time of the violation; and (3) ... given the facts most favorable to the plaintiff [], there are no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated [Murphy's]

right[s]. [] Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate. [Defendant] bears the burden of proving that the plaintiff's First Amendment rights were not clearly established." Burnham v. Ianni, 119 F.3d 668, 673-4 (CA8 1997).

## Discussion

The facts of the instant case vis-a-vis the three prong test of Burnham reflects that Defendants knew or should have known that their acts and/or omissions were violating Murphy's rights:

(1) Murphy has asserted a prima facie violation of Constitutional rights. The First Amendment is the bedrock of the Constitution and religious freedom the driving force behind the founding of America.

(2) That Murphy's rights as a follower of Christian Separatism were clearly established at the time of the violation is reflected in Murphy's prior cases against the MDOC (Murphy v. MDOC, 769 F.2d 502 (CA8 1985)(Murphy I) and 814 F.2d 1252 (CA8 1987)(Murphy II)(reflecting long-standing systemic violations of Murphy's First Amendment rights). In fact, Murphy's Christian Separatist accommodation would have been ruled on about fifteen years ago had it not been for the MDOC false posture/fraudulent defense of alleging that Murphy had not formally petitioned officials for accommodation. Thus the MDOC alleged that Murphy's request for accommodation was not "ripe" for adjudication. More recently the United States Court of Appeals for the Eighth Circuit in Williams v. Brimeyer, supra, (citing Murphy II) granted damages for denial of another Christian Separatist

prisoner's constitutional rights evincing that Murphy's belief system was constitutionally viable in the Eighth Circuit in 1997.

(3) As reflected in the trilogy of cases above (_Murphy I & II_, and _Williams_)[2] Defendants were aware that their prior defenses to accommodation of Christian Separatism (i.e., Murphy's alleged failure to formally petition officials and, "ripeness doctrine") were no longer viable.

Murphy submits that the facts reflect that Defendants were recklessly or callously indifferent to Murphy's rights to practice his religion and that their conduct was motivated by evil motive or intent. Therefore damages are appropriate. See, _Badami_ @ 997.

It is difficult to describe the anger and frustration Murphy has suffered. Communications from church groups stolen by the prison mail room. Seeing the Black Islamic groups with the trappings of their faith going to the prison chapel (with the same scenario being broadcast on the institutional television channel) . Special Islamic meal services for religious holidays are obvious to all. When in the yard one can hear the Native American group chanting and drum being played in a special area of the

---

**2/** "It is not hard to imagine a decision, for example, that presents its 'holding' or 'rule' no more broadly than the facts of the case require but that on its face or in its historical context establishes -- perhaps even beyond peradventure -- that the principle lying behind the holding or rule will take the law further as soon as a case arises that calls for the extention." _Federal Habeas Corpus Practice And Procedure_, by Liebman and Hertz, 3d, §25.5, pages 1007-08.

compound.

The "born-againer" groups carry their Bibles and tracts and carry on open proselytizing (they also have broadcasts on the institutional television channel). Finally the meeting with the rude obnoxious prison chaplin whose interest was not in religion but in race.

Numerous times Murphy has suffered loss of sleep, nausia, trembling and mental and emotional injuries due to the anger and frustration of the Defendants' systemic posture of accommodating everyone except Christian Separatists.

## CONCLUSION

History reflects that "[r]eligions now accepted were persecuted, unpopular and condemned at their inception." <u>Africa v. Commonwealth of Penn</u>., 662 F.2d 1025, 1031 (CA3 1981). Defendants point to no reason for denial of accommodation -- there is no criteria given in the MDOC rules (this is not surprising because Defendants generally do not deny accommodation to religious groups). As the Eighth Circuit held in <u>Cuffley v. Mickes</u>, 208 F.3d 702, 707, 712 (CA8 2000):

> "Nevertheless, absent a convincing and constitutional reason for the denial, the evidence leaves us with but one conclusion: that the [Defendants] denied [Murphy's accommodation] application based on [his] beliefs and advocacy. For the last fifty years, the Supreme Court has made it clear that such a denial is unconstitutional:
>
> > [Defendants] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.... For if the [Defendants] could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the [Defendants] to 'produce a result which [they] could not command directly.'

> Such interference with constitutional rights is impermissible. [] Whether the claim arises under the Equal Protection Clause or the First Amendment, it is clear that the [Defendants] may not deny access to [religious accommodation] based on the applicant's views."

Defendants willfully and maliciously denied Murphy's First and Fourteenth Amendment rights in: 1) denying religious accommodation in violation of the First Amendment's Free Exercise Clause, 2) promoting other religious groups in violation of the First Amendment's Establishment Clause, 3) promoting other religious groups while simultaneously denying Murphy's requested accommodation in violation of the Fourteenth Amendment's Equal Protection Clause, and as a result of such acts of Defendants, Murphy requests $10 per day in punitive damages.

WHEREFORE, Murphy prays for a judgment granting:

1. Declaration that Christian Separatism is a religion with First Amendment protection.

2. Injunction ordering accommodation of Christian Separatism in the MDOC on equal footing with other accommodated religious groups.

3. Actual damages of $10 per day from Defendants and each of them.

4. Punitive damages of $10 per day from Defendants and each of them.

5. Cost of this suit.

And for such other and further relief as the Court deems just and proper.

Dated this 8th day
of November, 2000

Respectfully submitted,

Michael Dunham Murphy #36193
Crossroads Correctional Center
1115 E. Pence Rd.
Cameron, MO 64429

Plaintiff pro se

24

<u>LIST OF EXHIBITS</u>

Exhibit #

1     Institutional Grievance, a composite exhibit reflecting exhaustion of institutional remedies (8 pages).

2     Inmate Canteen Fund spending reflecting money spent on religious groups (4 pages).

3     Memorandum from Defendant Winfrey Dickerson.

4     Religious Accommodation Requests to Defendants Dora Schriro and Elijah Nagbe reflecting certified mail receipt (3 pages).

5     MDOC Approved religious headgear, Institutional Supplement, IS22-1.1.

6     Map from church reflecting the reformation of the House of Israel in the West.

7     List of Christian Separatist Churches.

# STATE OF MISSOURI
## DEPARTMENT OF CORRECTIONS
### OFFENDER GRIEVANCE APPEAL

JUL 1 8 2000

CRCC

4D157B

| GRIEVANCE NUMBER | DATE FILED |
|---|---|
| 21-00-567 | |

| OFFENDER LAST NAME | FIRST |
|---|---|
| Murphy, Michael | |

| REGISTER NUMBER | INSTITUTION |
|---|---|
| 036193 | CRCC |

## REASON FOR APPEAL

Mr. Kemna's response presents a false posture. Murphy's first formal request for Christian Separatist Church services was sent on April 20, 2000 via IRR #04-24-00-026-04. The IRR went unanswered and on May 26th Murphy sent a Caseworker Request Form to H.U. #4 C.C.A. Mr. Lakey who responded "I have not received the IRR back from the reviewer. Would you like a grievance form?" Murphy then filed grievance #21-00-567 on June 2nd to which Mr. Kemna belatedly responded on July 13th denying the grievance.

Therefore, for the record, attached please find a REQUEST FOR ACCOMMODATION OF RELIGIOUS PRACTICES with Attachments (eleven (11) pages).

attachment: REQUEST FOR ACCOMMODATION OF RELIGIOUS PRACTICES

| OFFENDER SIGNATURE | DATE |
|---|---|
| Michael Murphy | 7/14/00 |

## RESPONSE

**OFFENDER COPY**

RECEIVED

JUL 2 0 2000

| SIGNATURE | DATE |
|---|---|
| | |

You are entitled to appeal this decision; however, you may not seek relief in Federal Court until the Director of the Department responds to the Citizens Advisory Committee recommendation. You must file your request for Citizens Advisory Committee review with the Grievance Officer within ten (10) days after receiving this response. Failure to submit an appeal within this time frame constitutes abandonment of the grievance.

☐ I accept this decision        ☐ I appeal this decision

☒ I exhaust this grievance pursuant to federal law, 28 CFR s 40.

| OFFENDER SIGNATURE | DATE |
|---|---|
| Michael Murphy | 9/6/00 |

MO 931-3378 (11-97)

STATE OF MISSOURI
DEPARTMENT OF CORRECTIONS
REQUEST FOR ACCOMMODATION OF RELIGIOUS PRACTICES

| INSTITUTION | HOUSING UNIT |
|---|---|
| CRCC | 4 |

DOC NUMBER
36193

**1. INMATE NAME**
Michael Dunham Murphy

**2. NAME OF THE RELIGIOUS GROUP FOR WHICH YOU ARE REQUESTING ACCOMMODATION**
Christian Separatist Church Society

**3. LIST WHERE YOU MOST RECENTLY WERE A MEMBER OF THIS GROUP**
I have held these beliefs for over 20 years

**GROUP NAME**
Christian Separatist Church Society

**ADDRESS**
P.O. Box 188

**CITY** Kodak   **STATE** TN   **ZIP CODE** 37764

*FILE COPY*

**4. WHAT SETS THIS GROUP APART FROM OTHER RELIGIOUS GROUPS?**
See Attached "#4 & #9"

**5. LIST THE NATIONAL OR INTERNATIONAL OFFICES.**

**NAME OF RELIGIOUS FAITH GROUP**
Christian Separatist Church Society

**OTHER NAMES BY WHICH IT MAY BE KNOWN:** Related to (but not): Israel Identity; Christian Identity; British Israelism

**NAME OF NATIONAL OR INTERNATIONAL LEADER**
Under Jesus Christ, our present International leader is Pastor Vann S. Herre

**ADDRESS**
P.O. Box 188

**CITY** Kodak   **STATE** TN   **ZIP CODE** 37764

**6. WHERE IS THE GROUP NEAREST TO YOUR FACILITY LOCATED?**
To the best of my knowledge the Kodak, TN office, although I may be wrong.

**7. WHAT IS THE NAME OF THE PRIMARY RELIGIOUS TEXT OF THIS FAITH GROUP? (BIBLE, QUR'AN, ETC.)**
Holy Bible with Apocrypha, See also Attached "#8"

**8. LIST SOME RELATED SOURCE BOOKS ABOUT THE RELIGIOUS PRACTICES AND WHERE THEY CAN BE OBTAINED.**
See Attached "#8 & #12"

**OFFENDER COPY**

**9. WHAT ARE THE MAJOR BELIEFS OR DOCTRINES OF THIS RELIGION?**
See Attached "#4 & #9"

**10. WHEN AND WHERE DID THIS RELIGION BEGIN?**
With the creation of Adam, Reformed by our Master Jesus Anointed.

**11. ARE THERE FUNDAMENTAL BELIEFS OF THE RELIGION THAT MUST BE PRACTICED EVEN WHILE ONE IS INCARCERATED? ☐ YES ☐ NO   IF "YES", PLEASE LIST:**
"Study to show thyself approved;" Keep oneself from every evil thing (fight against sin), which can also be called "keeping the sabbath," Help brothers i their struggle against sin; Teach, Speak & Act as one near Judgment by God.

**12. LIST THE ARTICLES REQUIRED TO PRACTICE THIS RELIGIOUS ACTIVITY.**
See Attached "#8 & #12" and, Christian Separatist Cross pins, necklaces, patches, sacraments for communion w/ utensils, but especially study aids.

**13. LIST THE MANDATORY HOLY OR SACRED DAYS.**
See Attached "#13"


**FILE COPY**

**OFFENDER COPY**

#4 & #9: "What sets this group apart from other religious groups;" and, "What are the major Beliefs of doctrines of this religion?"

## BASIC BELIEFS OF CHRISTIAN SEPARATISTS THAT DIFFER GREATEST FROM JUDEO-CHRISTIAN SECTS

[A] THAT we believe in One God, Who is the Almighty, the Creator, the All-Powerful One, the Eternal, Who has manifest His Attributes and Character and Will in the Scriptures (Bible) as delivered and preserved by the Israel of God and Who has also manifest His Laws and Character in the laws of Nature itself which He created. We believe that God Almighty has brought into existence with His Word. We believe that God Almighty is absolute Justice, Immutable in His Integrity and Honor, absolute Holiness in Separation from evil. He is therefore the absolute Good and is the Biblical definition of True Love.

That God, in His Wisdom and foreknowledge of things that were to come, prepared for Himself a Body, the Adamic Man Christ Jesus, the Messiah, for His purposes, and was anointed from the foundations of the world. Christ Jesus Anointed, Who is the Only-Begotten God, who is the eternal Word, the Logos, the expressed Mind of God, who was with God and was God. He is the true Light which illuminates the minds of Adamic men, through Him the flame of the Light of Truth in all ages has proceeded from the Father of lights. Jesus Anointed came to complete, accomplish, and finish His work, fulfilling all things written of Him.

[B] THAT the race and lineage of Adam are today found to be the White, Caucasian, Aryan peoples on the earth. The word "Adam" in the Hebrew describes a people who were able to; "show blood (in the face), i.e. flush or turn rosy." (Refer to Strong's Concordance #119, over 500 usages.) The Hebrew Old Testament word "Adam" is translated as "man," proving the race of the biblical Old Testament to be the White Race. Quoting from Genesis 5:1-2, "This is the book of the generations (race) of Adam in the day that God created man (adam), in the likeness of God made he him; male and female created he them; and he blessed them, and He Called their name Adam, in the day when they were created." (King James Version).

[C] THAT there were other races on the earth before the time of Adam. This is provable when the Bible states that Cain, after murdering Abel and being driven from the land by God, went to the "land of Nod," took a wife and built a city--obviously among another race not related to Adam-kind. (Refer to Genesis 4:9-17).

[D] THAT "Noah's Flood" was not a worldwide occurrence, but only covered "the land" in which Noah lived. This is evidenced not only by secular archeology and history, but also by the Bible. Prior to the Flood, "God saw that the wickedness of man was great in the earth (#776 'erets' meaning 'land'), and that every imagination of the thoughts of his heart was only evil continually." (Genesis 6:5). "And...every living, even I do bring a flood of waters upon the earth (#776 'erets', meaning land), to destroy all flesh, wherein is the breath of life, from under heaven; and every thing that is in the earth (#776 'erets' meaning 'land') shall die." (Genesis 6:17). "The word translated "earth" in these verses is from the Hebrew word "erets" which is also used in the story of Cain, where he sayeth [#727 'adamah' meaning 'soil' from its redness] and from thy face shall I be hid; and I shall be a fugitive and a vagabond in the earth [#776 'erets' meaning 'land']; and it shall come to pass, that everyone that findeth me shall slay me." (Genesis 4:14). "And Cain went out from the presence of the Lord, and dwelt in the land (#776 'erets' meaning land) of Nod, on the east of Eden." (Genesis 4:16). Since Cain was driven from the land "erets" and that Cain was not cast into outer-space and that he must have remained earth-side, then we must conclude that the Flood was not world-wide because it did not cover the planet "earth" but rather a particular "land." (Hebrew references from Strong's Concordance #776 and #127).

It should be noted here that a major tenant of Judeo-Christian theology is that man descended from Noah. But knowing Christianity's flood was not worldwide proves along with science and anthropology that Caucasians do not give birth to Negroe babies, nor do Negroes give birth to Caucasian babies. We further recognize that: Noah was preserved from the Flood because "...Noah was a just man and perfect in his generations (race), and Noah walked with God." (Genesis 6:9). Also: Scientists have argued, reasonably, that there is no way that Pairs of every animal they are correct since the original autographs of the Bible never said this. Nor does the Bible say that all Adamites or other existing races perished in the flood--only that every living thing in that "land" perished in Noah's Flood.

[E] THAT Israel was a branch of the Adamic race, separated and set apart by God for their preservation and the preservation of the racial branch of the Adamic racial branch of Israel was preserved through Abraham, Isaac and Jacob (who later became Israel). The practice of racial separation and purity was upheld when Abraham commanded his eldest servant to "not take a wife unto my son [Isaac] of the daughters of the Canaanites, among whom I dwell: but thou shalt go unto my country, and to my kindred, and take a wife unto my son Isaac." (Gen. 24:2-4). And later Jacob/Israel was commanded by his father Isaac: "Thou shalt not take any of the daughters of Canaan." (Gen. 26:1). This was after his righteous mother was grieved by the race-mixing of her eldest son Esau and his alien wives, she lamented: "if Jacob take a wife of the daughters of Heth, such as these which are of the

FILE COPY

OFFENDER
COPY

daughters of the land, what good shall my life do me?" (Gen. 27:46). This practice of Separation is a major theme of the Old Testament, and is repeated over and over. More examples include: Exodus 23:12-33. Leviticus 19:18-19; 20:24. Numbers 25:1-18: 33:55-56. Deuteronomy 7:1-6; 17:15; 32:8-9. Joshua 23:12-13. Judges 3:1-8. Ezra chapters 9 & 10. Nehemiah 13:3; 13:23-31. Isaiah 13:13-14. Ezekiel 36:19-20; 44:9. Hosea 5:6-7. Such verses represent only a minor list of similar verses throughout Scripture.

[F] THAT when ancient Israel continually sinned and failed God and His Law/Word, they were sent into two separate captivities; the first was captivity to Assyria; and later a small portion of Judah was captive to Babylon. The Assyrian captivity is outlined in II Kings chapters 17 & 18, where the northern ten tribes of Israel and a major portion of the southern two tribes of Judah were taken away to Assyria and never returned. Later, the rest of Judah was largely Jerusalem, was taken captive and removed to Babylon as recorded in II Kings 24 & 25. While Christians are largely familiar with the Babylonian captivity, and the subsequent return of a very small portion of Judahites mentioned in Ezra and Nehemiah, Judeo-Christians completely ignore the much, much greater number of captive Israelites that were taken captive to Assyria, and who NEVER returned. These people numbered in the millions, and after the collapse of Assyria were scattered to the four corners of the earth and became known as the "Lost Sheep of the House of Israel" and "The Dispersion".

The collapse of Assyria, and escape of its captive nations, including the House of Israel, took place around 700 B.C. It was during this same era in history that a branch of the White race first migrated into the Caucasus Mountains, presenting modern contention that these Caucasians were one branch of the Lost Sheep of the House of Israel that escaped Assyria when it collapsed.

While there is much more evidence of the "dispersion" of Lost Israel, another piece of evidence can be found in the Apocrypha in II Esdras 13:40-45. "Those are the ten tribes, which were carried away prisoners out of their own land in the time of Osea the king, whom Salmanasar the king of Assyria led away captive, and he carried them over the river, and so came they into another land. But they took this council among themselves, that they would leave the multitude of the heathen [nations], and go forth into a further country, where never mankind dwelt. That they might there keep their statutes, which they never kept in their own land. And they entered into Euphrates by the narrow passages of the river. For the most High then shewed signs for them, and held still the flood, till they were passed over. For through that country there was a great way to go, namely, of a year and a half: and that same region is called Arsareth ['Another Land']". (Apocrypha, King James Version).

[G] THAT Jesus Anointed (Christ) did not come for everyone, but rather, He said: "I was not sent except to the lost sheep of the House of Israel". (Matt. 15:24). And He commanded His disciples

to act in the same manner, "Do not go into the way of the nations, and do not enter into a city of the Samaritans; but rather go to the lost sheep of the House of Israel". (Matt. 10:5-6). And going on in the same vein, He continued by saying: "The Government of the Heavens has drawn near." (Matt. 10:5-7). Jesus did not even pray for the world, just His sheep, "I petition concerning them; I do not petition concerning the world, but for those whom You gave to Me, for they are Yours." (John 17:9).

[H] THAT the authors of the New Testament epistles addressed them to the racially pure tribes of Israel. "Jacob, a slave of God and of the Master Jesus Anointed, to the twelve tribes in the dispersion [Diaspora], greetings." (Jacob [James] 1:1). "Peter, an ambassador of Jesus Anointed, to the chosen sojourners of the dispersion of Galatia, of Cappadocia, of Asia, and of Bithynia, (I Pet. 1:1). When Paul wrote his letter to the "Romans", he was writing to the racially pure House of Israel. "What shall we say of our forefather, Abraham, to have found according to the flesh?" (Rom. 4:1), proving that those Romans he addressed were Israelites, sons of Abraham. Paul further stated in the epistle to the Romans, "For I myself was wishing to be a curse from the Anointed on behalf of my brothers, those of my same race according to the flesh, whose are the adoption and the reputation, and the covenants and the law-giving, and the service, and the promises; whose are the fathers, and of whom Jesus Anointed according to the flesh, He being God overall, blessed forever. So be it." (Rom. 9:3-5, it should be noted here, that "the adoption" applied to Israel, not to other races as Judeo-Christians believe). Similar evidence can be found in most New Testament epistles.

[I] THAT, as in the Old Testament, the New Testament allows Adamic non-Israelites to enter into the "Congregation of the Lord". providing for their citizenship as Israelites/Christians. In the Old Testament citizenship was determined by being racially acceptable, mentally acceptable (a citizen had to agree to live under the Laws of God), and was confirmed after three generations among the nations of Israel (Deuteronomy 23:8). In the New Testament, under the Government of Jesus Anointed, racially or acceptable, Adamic, non-Israelites who are welcome into the Family of Jesus Anointed, providing that they bear the marks of belief or persuasion, namely the "works" or actions of the Justification of Jesus Anointed. As Jesus told the Judeans in John 10:25-27, "I told you, and you were not persuaded. The works which I do in the authority of My Father, these bear witness about Me. But you are not persuaded, for you are not of My sheep. My sheep hear My voice, and I know them, and they follow Me." And Paul outlines those who were considered acceptable in his age: "Where there is not Greek and Judean, circumcision and uncircumcision, barbarian, Scythian, slave, freeman, but the Anointed is all things and in all things." (Col. 3:11). The races mentioned where members of the Adamic race in Paul's age, and made up the then known world. To the Galatians Paul wrote, "for you are all sons of God through persuasion in Anointed Jesus. For as many as were baptized into the Anointed, you put on the

- 3 -

OFFENDER
COPY

Anointed. There is neither Judean nor Greek; neither slave nor freeman; neither male nor female; for you are all one in Anointed Jesus! And if you are of the Anointed, then you are seed of Abraham and heirs according to promise (Gal. 3:26-29).

See also: Acts chapters 10 & 11 where Peter is shown that the God-fearing Roman Cornelius could receive the "Separating Mentality of God" (Holy Spirit).

[J] THAT the people today called "Jews" who claim to be the "chosen people" are the most fraudulent imposters on the very fact that they reject Jesus Anointed: "Who is the liar except the one denying that Jesus is the Anointed? This is the anti-Anointed [anti-Christ], the one denying the Father and the Son. Everyone denying the Son neither has the Father; the one confessing the Son has also the Father." (I Jn. 2:22-23). As Jesus Anointed told the "Jews" (Judeans), "But you are not persuaded, for you are not of My sheep..." (Jn. 10:24-27) If we are to identify "God's people" then we must examine the facts under the looking glass of the Bible and history: todays so-called "Jews" haven't accepted Jesus as the Anointed or Messiah for 2,000 years; the White Adamic race embraced Jesus Anointed as their Savior from its beginnings. "Christianity" has been the religion of the West, the religion of the European nations, from the earliest days. The Good News of Jesus Anointed was spread abroad by that White race but many generations back the White European nations were collectively called "Christendom" instead of Europe because that was our religion.

Judeo-Christians today believe that the people of the Bible were "Jews," to the point of calling Abraham and Moses "Jews." In the King James Bible, the word "Jew" does not appear until II Kings 16:6, prior to this the Tribe of Judah, "the Word "Jew" in this verse, should actually be translated "Judahite" meaning one who is a member of the tribe of Judah (See Strong's #3062). There is a division recorded in II Kings of the Northern 10 tribes who became known as "Israel" from the southern two tribes which became known as "Judah." While Judahites could have been called Israelites prior to this division from the other tribes, Israelites were never Judahites. Hence, never once in the Bible do we read of the twelve tribes of Jews. Abraham was a Hebrew, and, Moses was an Israelite.

The use of the term "Jew" in modern Bibles is confusing because while the King James Old Testament uses this term to define Judahites, in the New Testament the word "Jew" should read "Judean," meaning someone who is a citizen of or lives in the land of Judea (See: Strong's #2453). By the time of Jesus, the land of Palestine was divided into three parts: GALILEE in the north (where Jesus and all his disciples except Judas came from) SAMARIA in the middle (where a mixed group of people had been left after the Assyrians took Israel captive, II Kings 17:24), and JUDEA in the south where the small portion of Judahites returned after the Babylonian captivity (see Ezra and Nehemiah). When reading the New Testament, even the term "Judean" (as opposed to Jew) did

not include all Israelites in Palestine, only the Judeans--and certainly not the Lost-10 tribed sheep who were at that time already scattered throughout the known world of that age!

Concerning the people who today call themselves "Jews," the best source for their history is a book by the Jewish author Arthur Koestler titled The Thirteenth Tribe. In this book Mr. Koestler outlines the history of a racially mixed people called the Khazars who adopted Judaism (the Jewish anti-Christian religion). Moday Khazars make up "the Jews." The Khazars were not descended from the Tribes." Koestler admits, "The Khazars were not descended from the Tribes." Patal, in the 1954 Encyclopedia Brittanica, vol. 12, pg. 1054, states, "The findings of physical anthropology show that, contrary to popular view, there is no Jewish race. Anthropometric measurements of Jewish groups in many parts of the world indicate that they differ greatly from one another with respect to all important physical characteristics-- stature, weight, skin colour, cephalic index, facial index, blood groups, etc." Which is proof enough that they are mongrels and as such do not belong to the race of Adam. (See: Deuteronomy 23:2, the word "bastard" is mistranslated and means "mongrel"--Strong's #4464).

[K] THAT God is unchanging, making His Laws and Word eternal. This is a theme of both the Old and New Testaments: "Jesus Anointed the same yesterday, today, and forever." (Heb. 13:8). "For I am the Lord, I change not; therefore ye sons of Jacob [Israel] are not consumed." (Mal. 3:6). "I know that, whatsoever God doeth, it shall be forever: nothing can be put to it, nor anything be taken from it; and God doeth it, that men should fear before Him." (Ecc. 3:14). The unchangingness of God implies several things to White Christians; one being that the Mind, Word and Laws of God do not change; and that it is men who are unstable and changing. Because God does not change, we are persuaded that the Laws or Word of God have been a uniform constant since before Adam was created. That "The Law/Word of God existed before Moses is easily provable when God tells us that generations before Moses: ...Abraham obeyed My voice, and kept My charge, My commandments, My statutes, and My laws (Gen. 26:5). That God has not "done away" with His Laws nor "nailed them to the cross" as Judeo-Christians believe, is easily provable. The New Testament reaffirms each of the Ten Commandments, and as any Christian should know, the Ten Commandments are the heart of God's Laws. The New Testament also tells us that, "Whosoever committeth sin transgresseth also the law; for sin is the transgression of the law." (I Jn. 3:4). In this same verse transgression of the law. Everyone committing failures [sin] also does lawlessness, and failure [sin] is lawlessness." Sin, therefore, is not just the act of transgressing the Law/Word of God, but is also the absence of God's Laws, or lawlessness--which can also be called the absense of good works or actions. Some Judeo-Christian sects teach the "once saved always saved" lie, but the Word says: "Everyone transgressing and not abiding in the teaching of the Anointed does not have God. (II Jn. 1:9).

- 5 -

Case 5:00-cv-06134-GAF   Document 1   Filed 11/15/00   Page 38 of 52

FILE COPY

Anyone transgressing God's Law/Word, by acting in lawlessness, falls under the curse or punishment of God's Laws; but those working within the bounds of persuasion (faith) do not transgress God's Laws. James (Jacob) tells us that faith—or persuasion—without the actions/works of persuasion is dead (See: Jacob (James) 2:14-26). And that we are not saved from the punishment of the "second death" simply by "belief" in Jesus Anointed, but by the actions/works of persuasion (see Rev. 20:11-15). Further, Scripture states: "But you are led by the Mentality (Spirit), you are not under the law. Now the actions of the flesh are clearly revealed, which are: Mongrelization, whoredom, impurity, raping, idol-service, pharmakeia [includes things like: drug-pushing, witchcraft, abortion, etc.], enmities, strife, jealousies, angers, rivalries, divisions, heresies, envyings, murders, drunkenness, revelings, and the like these, which I tell you before, as I also said in times past, that those practicing these things will not inherit the Government of God. But the fruit of the Mentality (Spirit) is: honorable brotherly love, joy peace, long-suffering, kindness, meekness, persuasion (faith), meekness, self-control; against such things there is no law. And those of the Anointed have crucified the flesh with the passions and the lusts." (Gal. 5:18-24).

[L] THAT the one true baptism required in the Scriptures is the Baptism of Fire which Jesus came to administer. Of the Master Jesus Anointed John the Baptist said, "I indeed baptize you in water to repentance. But He coming after me is stronger than I, of Whom I am not worthy to bear the sandals. He will baptize you in the Mentality of Separation (Holy Spirit) and in Fire." (Matt. 3:11). That baptism cleanses the body and mind, and Mentality; he is not able to enter into the Government [Kingdom] of God. That one being born of the flesh is flesh, and that being born of the Mentality is Mentality." (Jn. 3:5-6). Paul tells us what the "water" Jesus mentioned is, and how Jesus Anointed, "loved the Body Politic (church) and gave Himself up on behalf of them, that He might separate them, purifying by the washing of the water by the Word (Eph. 5:25-26). It is this "Baptism of Fire," by the "renewing of the mind" of each Separated Christian, that we hold to be the One True Baptism. No amount of dunking in the polluted waters of the Missouri, no amount of sprinkling with chlorinated lead-filled hard-water, will "save" a man who would rather commit acts of lawlessness rather than follow the One Shepherd, The Anointed Jesus.

[M] THAT those nation that do not recognize or enforce the Laws of God will find themselves plagued by the national "curses" of Deuteronomy 28:15-68. And likewise, those nations which do enforce and recognize the Laws of God will receive Blessing from God! Deuteronomy 28:1-14. It is our contention that the troubles in the world today are a direct result of "national sins."

IN CONCLUSION: The foregoing views are only a few major areas of our beliefs that differ from other religions, they are by no means a complete list nor is every area addressed—that would take

volumes. Further information may be gained through study materials available from the Christian Separatist Church Society.

We would like to point out that while some may label us with the common buzzwords of "racist," "bigot," etc., we are no more so than those people who practice other common religions. The JEWS refer to non-Jewish races as "goyim" which literally means "human cattle," and they call themselves the chosen race of God; they further believe that Jesus Anointed was the bastard son of His mother Mary, who they call a whore, and had Roman soldier as a father. The Koran exhorts MUSLIMS to kill off Christians, Jews, and other non-Muslims; in Their Book of Repentance alone there are 16 such directives: 5, 9, 12, 14, 20, 24, 29, 36, 41, 44, 73, 81, 86, 88, 111, & 123. "Believers of the MORRIS SCIENCE religion refer to Whites as "blue-eyed devils. There are even JUDEO-CHRISTIAN sects which believe that it is their mission to cross-breed all races of the earth (in essence destroying the pure and individual creations of God's hands) so that no "race" exists—to many such a view is just another form of "genocide" or race-murder.

Our belief in "Separation" in all its forms may not be as popular in this age as in thousands of generations past, but it is strongly held and well established.

(Bible quotations are from: Anointed Standard Translation for New Testament quotations; and (for convenience only) the King James Version for Old Testament quotations.)

"But you are a chosen race, a royal priesthood, a Separated nation, a people for possession; so that you proclaim the virtue of the One Who has called you out of darkness into His marvelous light, you, who then were not a people but now are the people of God, those not pitied, but now pitied." 1 Peter 2:9-10.

OFFENDER COPY

FILE COPY

OFFENDER
COPY

# AFFIDAVIT

I, David C. Tate, do hereby swear and attest that the following statement and the facts it contains are true and correct to the best of my knowledge:

On 10-12-99 I received a mail rejection for a book titled "Standing On The Premises" by Lawrence Blanchard. In the course of determining whether or not I should be allowed to receive this book, it was sent to the CRCC Chaplain Mr. Nagabe who is a Negro. Refer to IRR # 99-019-04. After reviewing this book, which explains some biblical premises of the Israelit identity faith (a faith very similar to Christian Separatism), Mr. Nagabe judged the book to be "inflammatory" and would not "approve" it. The mailroom rejected it contrary to policy based partially on Mr. Nagabe's observation, although I was later allowed to receive it through the Grievance process.

After receiving my book I found it marked with questions marks "?" and "X" marks next to passages that referred to Adam being the first white man, and subjects dealing with Separation, and words like White and Aryan. Having seen similar marks on requests for religious materials sent to Mr. Nagabe, published in the prison "Canteen Meeting" report, I know these marks to be Mr. Nagabe's, the Mailroom does not make such marks.

Through experience, I have found the CRCC Chaplain, Mr. Nagabe, to lack the objectivity and "neutrality" to form any unbiased decisions regarding White Christian religious matters. I believe that it would be a fraud and a waste of time to submit a request for Christian Separatist religious services to Mr. Nagabe because he would find it "inflammatory" and reject the request out of hand.

Attested and signed this day of July 17, 2000, by David C. Tate:

David C. Tate
D.O.C. Number 155209

WITNESSED BY: _____

Michael D. Murphy W/36193
July 17, 2000.

c.c.

---

#8 & #12: "List some of related source books about the religious practices and where they can be obtained," and "List the articles required to practice this religious activity."

The major and most important article of our persuasion is the Holy Bible in both the Old and New Testaments with the books of The Apocrapha; our measure to determine the Bible as the standard of the New Testament: Briefly the New Testament does not claim to be "the Scriptures," it claims to be "The True Interpretation of the Scriptures"—and by the evidence from 'Textual Criticism' the Scriptures recognized and used by the authors of the New Testament was the Septuagint (the Greek O.T. or LXX). This is not to say that we do not refer to the New Testament as "the Scriptures," we do refer to the New Testament as our rule for faith and religious practices, because the True Interpretation (N.T.) gives us the Mind of Jesus Anointed on every issue. We hold that, not translations, but the original autographs of the Bible in their original language(s)—Greek for the LXX and N.T.—are the purest readings and final authority on Biblical questions and issues, therefore Greek language texts, lexicons and other study aids are also important for religious practice. Other study aids needed for religious practice should include, but are not limited to: All literature from the Christian Separatist Church Society/Herrell Brother Publishing House, P.O. Box 188/ 130, Kodak, TN 37764; The Anointed Standard Translation of the Bible; original 1611 King James Bible and Geneva Bible (for footnotes and historical value); the Septuagint with Apocrypha in Greek and English; the Greek New Testament in Greek text]: Liddell & Scott Greek/English Lexicon; Josephus in Greek and English; The Apostolic Fathers in Greek and English; Hebrew/ English Lexicon; Koine Greek language lessons; and other ancient texts and related writing such as The Dead Sea Scrolls, Pseudo-Pigrapha, etc.

#13 "List the mandatory Holy or Sacred Days:

Christian Separatists hold that Jesus Anointed is the Master of the Sabbath, and that if we are in His Rest and have His Mentality of Separation then every minute of every day, every week, and every year is His Sabbath. However, if a particular "day" must be requested for services, we hold to the rule of Proverbs 22:28 "Remove not the eternal landmarks which your fathers placed" (see also Deut. 27:17), which to us would mean that, as our fathers, we would request Sundays. As for "Holy Days," the entire Passion of Jesus—His Birth, Death, Resurrection, and Filling of the disciples with the Mentality of Separation on Pentecost—took place on and in accordance with the Old Testament "Feast Days" which Jesus Anointed fulfilled and completed, and we believe we should be mindful of these most important times in Christian history because of their significance, and would request those dates for special out-counts and services.

#8 & #12; and #13

DIVISION OF ADULT INSTITUTIONS
DIVISION DIRECTOR RESPONSE
CROSSROADS CORRECTIONAL CENTER

TO:           Murphy, Michael #036193

VS:           CRCC

CATEGORY:    2 - Activities

LOG:         21-00-567

DATE:        August 30, 2000

I am in receipt of your grievance appeal request of July 18, 2000 regarding the Department of Corrections considering accommodation of religious practices for the Christian Separatist Church Society. You have attached a Request for Accommodation of Religious Practices (with additional attachments) with your Grievance Appeal.

I have reviewed your complaint and pertinent information. You indicate that you had submitted a "formal request for Christian Separatist Church services via IRR 04-24-00-026-04". You state that the IRR went unanswered, and when you inquired about it you were asked if you wanted to submit a grievance. The response issued to you at the IRR and Grievance level informed you that you needed to complete a Request for Accommodation of Religious Practice form for consideration of religious services not provided at the institution. The institutional chaplain then submits the form to Central Office to make a determination concerning your request. Since you have attached a Request for Accommodation of Religious Practice with your Grievance Appeal #21-00-567, I will forward it to Mr. Winfrey Dickerson, Supervisor of Religious/Spiritual Programming, at Central Office for review. If you have any questions concerning this matter, I suggest that you contact Chaplain Nagbe at CRCC.

| 7/20/00 | 8/30/00 | |
|---|---|---|
| Date Received | Date Reviewed | Steve Long, Assistant Director |
| | | Division of Adult Institutions |

rw

cc: Chaplain Nagbe, CRCC
    Winfrey Dickerson, Supervisor of Religious/Spiritual Programming, Central Office
    file

**OFFENDER COPY**

TO:       Elijah W. Nagbe, Chaplin
          Crossroads Correctional Center
          1115 E. Pence Rd.
          Cameron, MO 64429

FROM:     Michael Murphy #36193
          Crossroads Correctional Center
          1115 E. Pence Rd.
          Cameron, MO 64429

IN RE:    Formal request for religious accommodation
          (sent via certified mail)

DATE:     July 24, 2000

Dear Chaplin Nagbe:
       Enclosed please find a copy of my Grievance #21-00-567 which
has attached a Request For Accommodation Of Religious Practices.
As reflected in the Grievance I submit that the handling of this
matter has not been in good faith.
       Therefore, in order to assure that you have had the
opportunity to properly consider this matter (which was originally
presented on April 20, 2000) it is now presented to you via
certified mail.

Respectfully submitted,


Michael Murphy


attachment: Grievance with attached Request For Accommodation
          Of Religious Practices.

cc: Dor
mail)

Kirl

Pas

<table>
<tr><td><strong>SENDER: COMPLETE THIS SECTION</strong></td><td colspan="2"><strong>COMPLETE THIS SECTION ON DELIVERY</strong></td></tr>
<tr><td rowspan="2">■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits.</td><td>A. Received by (Please Print Clearly)</td><td>B. Date of Delivery<br>7-26</td></tr>
<tr><td colspan="2">C. Signature<br>x     ☐ Agent   ☐ Addressee</td></tr>
<tr><td>1. Article Addressed to:<br>Elijah W. Nagbe, Chaplain<br>Crossroads Correctional Center<br>1115 E. Pence Rd.<br>Cameron Mo 64429</td><td colspan="2">D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No</td></tr>
<tr><td></td><td colspan="2">3. Service Type<br>☒ Certified Mail   ☐ Express Mail<br>☐ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D.</td></tr>
<tr><td>2. Article Number (Copy from service label)<br>Z 320 273 038</td><td colspan="2">4. Restricted Delivery? (Extra Fee)   ☐ Yes</td></tr>
</table>

Case 5:00-cv-06134-FJG Document 1   Filed 15/00   Page 42 of 52
PS Form 3811, July 1999            Domestic Return Receipt            102595-99-M-1789

```
TO:       Dora B. Schriro
          Director, MDOC
          P.O. Box 236
          Jefferson City, MO 65102-0236

From:     Michael Murphy #36193
          CRCC
          1115 E. Pence Rd.
          Cameron, MO 64429

IN RE:    Formal request for religious accommodation
          (sent via certified mail)

DATE:     July 24, 2000
```

Dear Ms. Schriro:

    Enclosed please find a copy of my Request For Accommodation Of Religious Practices with attachments. Per procedure CRCC Chaplin Elijah Nagbe was also served via certified mail. This matter is also proceeding via Institutional Grievance procedure.

    Since this matter presents a tortured history spanning almost twenty years, notification on you as Director is necessary due to evasive tactics in the past by the MDOC.

    I trust that you will take the time to seriously consider this very important matter. I look forward to hearing from you.

Sincerely,


Michael Murphy


attachments: Grievance with attached Request For Accommodation Of Religious Practices.


cc:  file
     Kirk Lyons,
     Pastor Vann

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Dora D. Schriro*
*Director, Missouri Dept. of Corrections*
*2729 Plaza Drive*
*P.O. Box 236*
*Jefferson City, MO 65102-0236*

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) | B. Date of Delivery
*Fisher* | 27 JUL 20

C. Signature
X | ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Copy from service label)
*Z 385 725*

PS Form 3811, July 1999     Domestic Return Receipt     102595-99-M-1789

MURPHY, MICHAEL #36193        H.U.#4D-157

TATE,    DAVID C. #1552209    H.U.#3B-225


JULY 26, 2000


I ACKNOWLEDGED RECEIPT OF YOUR REQUEST FOR RELIGIOUS ACCOMODATION. I
WILL DISCUSS YOUR REQUEST WITH THE PROPER AUTHORITY.

ELIJAH W. NAGBE, CHAPLAIN
Crossroads Correctional Center

STATE OF MISSOURI
DEPARTMENT OF CORRECTIONS
**INMATE MOVEMENT PASS**

| | | DATE 7/26/00 |
|---|---|---|
| INMATE NAME (PRINT) Murphy Michael | | REGISTER NUMBER 36193 |
| HOUSING UNIT HU #4-157 | ASSIGNMENT | |
| TO Chaplin | LEAVE 730 | AUTHORIZING STAFF SIGNATURE |
| | ARRIVE 238 | STAFF SIGNATURE |
| TO | LEAVE 3 | AUTHORIZING STAFF SIGNATURE |
| | ARRIVE | STAFF SIGNATURE |
| TO | LEAVE | AUTHORIZING STAFF SIGNATURE |
| | ARRIVE | STAFF SIGNATURE |

MO 931-2338 (7-89)



Missouri                                         Mel Carnahan, Governor

## DEPARTMENT OF CORRECTIONS
**Crossroads Correctional Center**

1115 East Pence Road
Cameron, Missouri 64429
816-632-2727
816-632-2754 (Fax)

Dora B. Schriro, Ed.D., Director

George A. Lombardi, Director
Division of Adult Institutions

Michael Kemna, Superintendent

### MEMORANDUM

DATE:     FEBRUARY 3, 2000

TO:        MIKE KEMNA, SUPERINTENDENT

FROM:    DEANN ADAMS, BUSINESS MANAGER

SUBJECT: CANTEEN MEETING

On February 3, 2000 the Inmate Canteen Meeting for the Crossroads Correctional Center was held. Those attending were: DeAnn Adams, Business Manager; Steve Marlay, Rec. Officer III; Elijah Nagbe, Chaplain; Rebecca Holt, Librarian; Allison Deatherage, IAC; Jackie Nichols, Acct. Clerk II; Richard Sanders #37564; Willie Ayers #504068.

All requests from the Preliminary Canteen Meeting were reviewed by Rodney Kueffer, Inmate Finance Officer and Winfrey Dickerson, Supervisor of Religious/Spiritual Programming. Several sections submitted additional requests which were then approved by the committee. Gross Available Funds were stated as being $117,506.71. After deducting a 25% buffer the net available funds were $88,130.03. Following is a list of proposed and approved expenditures for each department:

| DEPARTMENT | ORIGINAL REQUEST | PROPOSED | APPROVED |
|---|---|---|---|
| Cable TV Programming (3 mos. @ 2871.00) | $8,613.00 | $8,613.00 | $8,613.00 |
| Cable TV Processor and Supplies (Religious Channel) | 1,335.30 | 1,335.30 | 1,335.30 |
| Cable TV Rewiring Supplies | 3.640.72 | 3,640.72 | 3,640.72 |
| ■■■■■■■■ | ■■■■ | ■■■■ | ■■■■ |
| Law Library Fees | 3,900.00 | 3,900.00 | 3,900.00 |
| Video Rentals | 500.00 | 500.00 | 500.00 |
| Visiting Room | 300.00 | 300.00 | 300.00 |
| Recreation | 8,616.05 | 8,616.05 | 8,616.05 |
| Library | 7,525.36 | 7,525.36 | 7,525.36 |
| I.A.C. | 3,238.01 | 3,238.01 | 3,238.01 |
| Inmate Canteen | 0.00 | 499.99 | 499.99 |

** AN EQUAL OPPORTUNITY EMPLOYER **
*Services provided on a non-discriminatory basis*
AD EXCELLEUM CONAMUR ★ WE STRIVE TOWARDS EXCELLENCE

Religion

| | | | |
|---|---|---|---|
| MSTA #1 | 456.10 | 456.10 | 62.40 |
| MSTA #43 | No Request | | |
| Muslim | 396.75 | 396.75 | 216.60 |
| Native American | 397.51 | 397.51 | 154.50 |
| Non-Denominational | 330.33 | 330.33 | 129.90 |
| Catholic | 399.52 | 399.52 | 349.58 |
| Wicca | 297.77 | 297.77 | 36.15 |
| Nation of Islam | 402.00 | 402.00 | 78.00 |
| Jehovah's Witnesses | 395.80 | 395.80 | 292.55 |
| Office Supplies/Equipment | 2,186.40 | 2,186.40 | 2,186.40 |
| | ---------------- | ---------------- | ---------------- |
| **TOTALS** | $44,550.62 | $44,527.91 | $43,294.51 |

cc:  Rodney Kueffer, Inmate Finance
     William Wayne, A.S.O.
     Steve Marlay, Rec. Officer III
     Alijah Nagbe, Chaplain
     Allison Deatherage, IAC
     Becky Holt, Acting Librarian
     Marlilyn Love, Canteen
     Housing Units



Missouri                  Mel Carnahan, Governor

# DEPARTMENT OF CORRECTIONS
**Crossroads Correctional Center**

1115 East Pence Road
Cameron, Missouri 64429
816-632-2727
816-632-2754 (Fax)

Dora B. Schriro, Ed.D., Director

George A. Lombardi, Director
Division of Adult Institutions

Michael Kemna, Superintendent

## MEMORANDUM

DATE:      AUGUST 1, 2000

TO:      MIKE KEMNA, SUPERINTENDENT

FROM:      DEANN ADAMS, BUSINESS MANAGER

SUBJECT: CANTEEN MEETING

On August 1, 2000 the Inmate Canteen Meeting for the Crossroads Correctional Center was held. Those attending were: DeAnn Adams, Business Manager; Steve Marlay, Rec. Officer III; Elijah Nagbe, Chaplain; Rebecca Holt, Librarian; Dana Hughes, Visiting Room Liason; Jackie Nichols, Acct. Clerk II; Anthony Mozee #517528; John Sexton #522950.

All requests from the Preliminary Canteen Meeting were reviewed by Rodney Kueffer, Inmate Finance Officer and Winfrey Dickerson, Supervisor of Religious/Spiritual Programming. Several sections submitted additional requests which were then approved by the committee. Gross Available Funds were stated as being $106,432.43. After deducting a 25% buffer the net available funds were $79,824.33. Following is a list of proposed and approved expenditures for each department:

| DEPARTMENT | ORIGINAL REQUEST | PROPOSED | APPROVED |
|---|---|---|---|
| Cable TV Programming (3 mos. @ 2871.00) | $8,613.00 | $8,613.00 | $8,613.00 |
| G.E.D. Testing | 1,620.00 | 1,620.00 | 1,620.00 |
| Law Library Fees | 3,900.00 | 3,900.00 | 3,900.00 |
| Video Rentals | 500.00 | 500.00 | 500.00 |
| Visiting Room | 552.64 | 552.64 | 552.64 |
| Recreation | 14,660.12 | 20,074.12 | 20,074.12 |
| Library | 16,942.91 | 17,173.56 | 17,173.56 |
| I.A.C. | 2,781.35 | 2,781.35 | 2,781.35 |
| Inmate Canteen | 1,255.96 | 1,255.96 | 1,255.96 |

** AN EQUAL OPPORTUNITY EMPLOYER **
*Services provided on a non-discriminatory basis*
AD EXCELLEUM CONAMUR ★ WE STRIVE TOWARDS EXCELLENCE

Religion

| | | | |
|---|---|---|---|
| MSTA #1 | 0.00 | 0.00 | 0.00 |
| MSTA #43 | 391.65 | 166.00 | 166.00 |
| Muslim | 396.74 | 50.00 | 50.00 |
| Native American | 398.35 | 220.40 | 220.40 |
| Non-Denominational | 350.13 | 23.90 | 23.90 |
| Catholic | 360.49 | 86.95 | 86.95 |
| Wicca | 283.99 | 0.00 | 0.00 |
| Nation of Islam | 341.00 | 80.00 | 80.00 |
| Jehovah's Witnesses | 0.00 | 0.00 | 0.00 |
| Office Supplies/Equipment | 221.00 | 1,719.91 | 1,719.91 |
| | ---------------- | ---------------- | ---------------- |
| TOTALS | $53,569.33 | $58,817.79 | $58,817.79 |

cc:   Rodney Kueffer, Inmate Finance
William Wayne, A.S.O.
Steve Marlay, Rec. Officer III
Alijah Nagbe, Chaplain
Allison Deatherage, IAC
Becky Holt, Acting Librarian
Marlilyn Love, Canteen
Dana Hughes, Visiting Room Liason
Housing Units



# DEPARTMENT OF CORRECTIONS

Division of Human Services
2729 Plaza Drive
P.O. Box 236
Jefferson City, Missouri 65102
573-751-2389 TDD Available
573-751-4099 (Fax)

Dora B. Schriro, Ed.D., Director

Alma G. McKinney
Division Director

## MEMORANDUM

Date:       November 1, 1999

To:         ALL DEPARTMENT CHAPLAINS

From:       Winfrey Dickerson, Supervisor of Religious/Spiritual Programming

Subject:    Religious Organization Program Supervision

The purpose of accommodating religious/faith communities is to allow each accommodated religion the opportunity to have weekly times of worship, study, and prayer in a tradition similar to what would be found in the external community. Please have each organization without a regular volunteer submit a regular weekly program format. The format submitted should reflect the religious tradition that is represented. Additionally, only members of the respective tradition should be in positions of leadership or speaking before the group, unless a special ecumenical or inter-faith format has been authorized. Any individual belonging to one faith group but speaking before another should have approval prior to doing so. It is recommended that any offender who does so without authorization should not be allowed to hold a position of leadership in any accommodated group, speak before any religious group, or to serve as a clerk in the chapel for a minimum period of one year. Any group which does not have enough program content to justify two weekly meeting times in its own religious tradition should have its weekly meeting times shortened or meet only once per week. Services with volunteers should be monitored periodically relative to the above program and leadership issues. *You may share this information with your religious communities.*


cc: Supervising Associate/Assistant Superintendent
    File



PHYLACTERIES

fez

skullcap

KUFEE



SUPPOSE THE LOST (12) TRIBES OF ISRAEL ARE THE ANGLO SAXON CELTIC - GERMANIC SCANDINAVIAN AND KINDRED PEOPLE? WHAT DIFFERENCE DOES IT MAKE TO YOU - AMERICA, AND CHRISTENDOM?

ISRAEL'S TRIBAL MIGRATIONS TO "THE APPOINTED PLACE."

## The Reformation of Israel in the West

Exhibit 7

LIST OF CHRISTIAN SEPARATIST CHURCHES AND STUDY MATERIAL SOURCES.

Scriptures for America
P.O. Box 766
LaPorte, Colorado 80535

America's Promise
P.O. Box 157
Sandpoint, ID 83864

Mission To Israel
P.O. Box 248
Scottsbluff, Nebraska 69363

Kingdom Identity Ministries
P.O. Box 1021
Harrison, Arkansas 72602

Stone Kingdom Ministries
P.O. Box 6388
Asheville, N.C. 28816

Jubilee
P.O. Box 310
Midpines, CA 95345

The Christian Kingdom Publications
Box 453
Institute, West Virginia 25112

Christian Crusade For Truth
HC 66 Box 39
Deming, N.M. 88030

Christian Separatist Church Society
P.O. Box 188
Kodak, TN 37764-0188

Faith Baptist Ministries
P.O. Box 188
Houston, MO 65483

Hoskins Newsletter
P.O. Box 977
Lynchburg, VA 24505

The Waters Letter
Keith & Elva Larsen
P.O. Box 577
Southington, CT 06489-0577